Domenic A. Cossi, Esq.
Maxwell E. Kirchhoff, Esq.
Adam M. Shaw, Esq.
**WESTERN JUSTICE ASSOCIATES, PLLC**
303 W Mendenhall, Suite 1
Bozeman, MT  59715
Telephone: (406) 587-1900
*domenic@westernjusticelaw.com*
*max@westernjusticelaw.com*
*adam@westernjusticelaw.com*

Jonathan M. Jagher*
Nicholas R. Lange*
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6486
*jjagher@fklmlaw.com*
*nlange@fklmlaw.com*
        *\*pro hac vice forthcoming*

*Counsel for Plaintiff and the putative class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| CARLY LESKOVAR, on behalf of herself and on behalf of all others similarly situated, | Case No.:  CV-24-167-BU-BMM |
| Plaintiff, | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| SNOWFLAKE., INC., | |
| Defendant. | |

Plaintiff Carly Leskovar ("Plaintiff"), by her undersigned counsel, files this Class Action Complaint individually and on behalf of a class of all similarly situated persons against Snowflake, Inc. ("Defendant" or "Snowflake"). Plaintiff bases the following allegations on personal knowledge, due investigation of counsel, and, where indicated, on information and belief, and states the following:

## NATURE OF THE ACTION

1.    Defendant describes itself as a leading provider of cloud storage and AI-driven data processing services to many of the largest corporations in the world across a broad range of industries, including Adobe, AT&T, Kraft Heinz, Mastercard, Micron, Capital One, Doordash, HP, Nielsen, Novartis, Okta, PepsiCo, Siemens, Instacart, JetBlue, Yamaha, US Foods, Western Union, Advance Auto Parts, Ticketmaster, Santander Bank, Neiman Marcus, and NBC Universal. Snowflake served 9,437 total customers as of January 31, 2024, including 691 of the Forbes Global 2000. In January 2024, Snowflake reportedly processed an average of 4.2 billion *daily* queries across of its customers, nearly twice the customer activity over the same period in 2023. [1]

2.    As a major provider of cloud data storage services to the world's largest

---

[1] Snowflake Inc., Form 10-K, U.S. Sec. Exch. Comm'n (March 26, 2024), https://www.sec.gov/Archives/edgar/data/1640147/000164014724000101/snow-20240131.htm (last accessed July 17, 2024); Sergiu Gatlan, *Advance Auto Parts stolen data for sale after Snowflake attack*, BLEEPING COMPUTER (June 5, 2024), https://www.bleepingcomputer.com/news/security/advance-auto-parts-stolen-data-for-sale-after-snowflake-attack/  (last accessed July 17, 2024).

corporations, Snowflake understood it had the duty and responsibility to protect customers' information that it collected, stored, and maintained, expressly touting its networks as "secure" and providing customers the ability to "securely share data."[2] It goes as far as to claim that its ability to provide secure data access and sharing differentiates it from its competitors.[3] Defendant failed to meet its duty and, as a direct result, hundreds of millions of customers and customers' sensitive information with which it was entrusted was released, stolen, and made publicly available on the dark web in what is quickly becoming one of the largest data breaches ever to occur.

3.    Upon information and belief, beginning around mid-April 2024, unauthorized parties reportedly increased their efforts to unlawfully enter Snowflake's systems, obtaining sensitive personally identifying information ("PII") from many of Snowflake's largest customers, including PII relating to over 560 million of Ticketmaster, LLC's ("Ticketmaster") customers.[4]

4.    For example, the sensitive PII Ticketmaster was housing in Snowflake's systems that was released to the threat actor included, at a minimum,

---

[2] 2023 Form 10-K, n.1, *supra*.
[3] *Id.*
[4] Sergiu Gatlan, *Snowflake account hacks linked to Standander, Ticketmaster breachers*, BLEEPING COMPUTER (May 31, 2024), https://www.bleepingcomputer.com/news/security/snowflake-account-hacks-linked-to-santander-ticketmaster-breaches/ (last accessed July 17, 2024).

"full names, addresses, email addresses, phone numbers, ticket sales and event details, order information, and partial payment card data. [The] compromised payment data includes customers names, the last four digits of card numbers, expiration dates, and even customer fraud details."[5] This Data Set was also made available publicly on the open web.[6]

5.     Worse yet, Defendant's failure to safeguard PII residing on its systems was not limited to that of Ticketmaster's customers. The threat actor accessing Snowflake's systems claimed that they stole data from other companies, including Anheuser-Busch, State Farm, Mitsubishi, Progressive, Neiman Marcus, Allstate, and Advance Auto Parts.[7] Indeed, as set forth *infra*, in total the Data Breach is reported to have impacted hundreds of millions of customers and employees of 165 companies.

6.     Despite being responsible for a tremendous about of PII, Defendant intentionally, willfully, recklessly, and/or negligently failed to implement reasonable security measures to safeguard sensitive PII within its possession and take necessary steps to prevent the unauthorized disclosure of that information.

---

[5] Waqas, *Hackers Claim Ticketmaster Data Breach: 560M Users' Info for Sale at $500k*, HACKREAD (May 28, 2024), https://hackread.com/hackers-ticketmaster-data-breach-560m-users-sale/. (last accessed July 17, 2024).
[6] *Lawrence Abrams*, *Ticketmaster confirms massive breach after stolen data for sale* online, BLEEPING COMPUTER (May 312, 2024), https://www.bleepingcomputer.com/news/security/ticketmaster-confirms-massive-breach-after-stolen-data-for-sale-online/ (last accessed July 17, 2024).
[7] *Id.*

7.     As a direct and proximate result of Defendant's inadequate data security measures, and its breach of its duty to handle PII with reasonable care, Plaintiff's and Class Members' PII have been accessed by hackers and exposed to an untold number of unauthorized individuals on the dark web.

8.     Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

9.     Plaintiff, on behalf of herself, and the Class as defined herein, brings claims for negligence, negligence *per se*, breach of third-party beneficiary contract, unjust enrichment, and declaratory judgment, seeking actual and putative damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one

member of the proposed class is a citizen of a state different than Defendant.

11.    This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant maintains its headquarters and principal place of business in Bozeman, Montana.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

## PARTIES

13.    Plaintiff Carly Leskovar is an adult, who at all relevant times, is and was a citizen and resident of the State of Montana. Since at least 2016, Plaintiff has been a customer of Ticketmaster, which is one of Snowflake's largest clients. Ticketmaster, along with at least 164 other companies, stores its data, including its customers' sensitive PII, in Snowflake's supposedly secure data storage systems. In the course of her interactions with Ticketmaster, Plaintiff provided her PII to Ticketmaster and, ultimately, to Snowflake. Due to the inherent sensitivity of Plaintiff's PII, Defendant's awareness that its systems were a target for threat actors seeking to gain unauthorized access, and its representations that data its clients housed on its systems were secure, Snowflake expressly and impliedly owed a duty to Plaintiff and Class Members to implement reasonable security measures to protect

their PII housed on its system.  Contrary to its duty, Defendant failed to take necessary steps to safeguard this data, causing cybercriminals to obtain Plaintiff's PII in the Data Breach. Plaintiff consequently received a notice from Ticketmaster informing her that her PII provided to Snowflake had been compromised in the Data Breach.

14.    Since the unauthorized access of her PII, Plaintiff has suffered emotional distress as a result of her PII being accessed and exposed to unauthorized third parties.

15.    As a result of the Data Breach, Plaintiff will continue to be at heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

16.    Snowflake., Inc. is a corporation organized under the laws of Delaware and maintains its headquarters and principal place of business at 106 E. Babcock, Suite 3A Bozeman, MT 59715.

## FACTUAL BACKGROUND

### A.    *Snowflake Knew the Risks of Storing Valuable PII and the Foreseeable Risk of Harm to Victims.*

17.    Snowflake was well aware that the troves of customer data it houses and processes, including PII, is highly sensitive and of significant value to those who would use it for wrongful purposes.

18.    Snowflake also knew that a breach of its computer systems, and release

of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised, as well as intrusion into their highly private information.

19.    These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

20.    PII is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft and medical and financial fraud.[8] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

21.    Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available. Indeed, the information compromised during the Data Breach has already been released on the internet.

22.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain

---

[8] *What To Know About Identity Theft*, Fed. Trade Comm'n Consumer Advice (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed July 17, 2024).

on individuals, businesses, and government entities in the U.S. In 2023, there were 3,205 data compromises affecting 353 million individuals, which set a record high number of data compromises in the U.S. in a single year, representing a 72% increase from the previous all-time high number of comprises set in 2021.[9]

23.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2019, approximately 650,000 people reported identity fraud compared to over a million people in 2023, representing an increase of approximately 19%.[10]

24.    The breath of data compromised makes the information particularly vulnerable to thieves and leaves Plaintiff and Class Members especially vulnerable to fraud and other risks.

25.    The ramifications of Snowflake's failure to keep Plaintiff and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

26.    Further, a data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

---

[9] *Facts + Statistics; Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last accessed July 17, 2024).
[10] *Id.*

A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[11]

27.    Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

28.    Moreover, unlike credit or debit card numbers in a payment card data breach, which may be frozen and reissued in the aftermath of a breach, information such as social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government

---

[11] Erika Harrell, Bureau of Just. Stat., U.S. Dep't of Just., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed July 17, 2024).

agencies and any number of private companies to update the person's accounts with those entities.

29.    The Social Security Administration even warns that the process of replacing a social security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[12]

30.    Social security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including

---

[12] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed July 17, 2024).

prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

31.     A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[13]

32.     In light of high-profile data breaches at other companies, Snowflake knew or should have known that its computer systems would be targeted by cybercriminals.

33.     Defendant also knew or should have known the importance of safeguarding the PII with which it was entrusted and of the foreseeable consequences if its data security systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach and release of its customers' PII from occurring.

---

[13] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed July 17, 2024).

**B.    Defendant Released Highly Sensitive PII to Hackers and Breached its Duty to Protect Customer PII.**

34.    Beginning in mid-April 2024, a cybercriminal threat actor group known as "Shiny Hunters" began a series of hacking attacks seeking to gain entry into Snowflake's systems that ultimately led to the threat actors accessing and exfiltrating data housed on Snowflake's systems by at least 165 corporate clients of Snowflake. The tremendous amount of exfiltrated data included highly sensitive PII relating to hundreds of millions of consumers and employees across the United States. Defendant's failure to implement reasonable security measures has resulted in PII housed by, *inter alia*, the following entities to be exfiltrated:

35.    **Ticketmaster**. On May 20, 2024, Live Nation Entertainment, Inc. ("Live Nation") identified unauthorized access of its data housed in Snowflake's systems. This breach exposed the PII of over 560 million users of Ticketmaster, a subsidiary of Live Nation. The stolen information reportedly contained 1.3 terabytes of data, including customers' full details such as names, home and email addresses, and phone numbers), as well as ticket sales, order, and event information for 560 million customers.[14] Worse yet, threat actors began offering this PII for sale via the dark web on May 27, 2024.[15] Ticketmaster's breach was reportedly the first to be

---

[14] Abrams, n.6, *supra*.
[15] *Id.*

linked to Snowflake's Data Breach.[16]

36.    **Advance Auto Parts.** On May 23, 2024, Advance Auto Parts, Inc. ("Advance") identified unauthorized access of its data it was housing in Snowflake's systems. After further investigation, Advance announced that stolen PII included "personal information for current and former employees [including full names and email addresses] and job applicants, including social security numbers and other government identification numbers." The stolen PII was reported to also include email addresses and names. On June 4, 2024, a hacker going by the name "Sp1d3r" confirmed that they had stolen three terabytes of data from Snowflake, which includes "380M customer profiles (name, email, mobile, phone, address, more), 140M customer orders, 44M Loyalty / Gas card numbers (with customer details), 358k Employees, auto parts / parts numbers, sales history, employment candidate info with SSNs, drivers license numbers, demographic details, transaction tender details, over 200 tables of data!". This information was also made available for purchase on the dark web.[17]

37.    **Neiman Marcus.** On May 24, 2024, The Neiman Marcus Group LLC

---

[16] Zack Whittaker, *What Snowflake isn't saying about its customer data breaches*, Tech Crunch (June 7, 2024), https://techcrunch.com/2024/06/07/snowflake-ticketmaster-lendingtree-customer-data-breach/ (last accessed July 17, 2024).

[17] Lawrence Abrams, *Advance Auto Parts confirms data breach exposed employee information*, BLEEPING COMPUTER (June 19, 2024), https://www.bleepingcomputer.com/news/security/advance-auto-parts-confirms-data-breach-exposed-employee-information/ (last accessed July 17, 2024).

discovered that between April and May 2024, personal data it was storing in Snowflake's systems was also stolen. This breach exposed sensitive PII of more than 31 million Neiman Marcus customers and employees, including their names, contact information (e.g., email and postal addresses, and phone numbers), dates of birth, gift card information, transaction data, partial credit card (without expiration dates or CVVs) and social security numbers, and employee identification numbers. The PII was also offered for purchase on the dark web by a threat actor using the handle "Sp1d3r."[18]

38.    **Lending Tree.** Lending Tree also confirmed its subsidiary QuoteWizard had data stolen that was housed within Snowflake's systems. On June 1, 2024, a hacker going by the name "Sp1d3r" confirmed that they had stolen sensitive PII of over 190 million people from QuoteWizard, which PII included "Full customer details, partial CC details (only middle 5 numbers masked), auto history, driving records, personal background information needed for insurance quotes, 3 billion tracking pixels from (contains PII, and IP/online tracking details)." This PII, as well, was made available for purchase on the dark web.[19]

---

[18] Sergiu Gatlan, *Neiman Marcus data breach: 31 million email addresses found exposed*, BLEEPING COMPUTER (July 8, 2024), https://www.bleepingcomputer.com/news/security/neiman-marcus-data-breach-31-million-email-addresses-found-exposed/ (last accessed July 17, 2024).

[19] Jonathan Greig, *LendingTree confirms that cloud services attack potentially affected subsidiary*, The Record (June 10, 2024), https://therecord.media/lendingtree-quotewizard-cybersecurity-incident-snowflake (last accessed July 17, 2024).

39.    **AT&T.** AT&T Inc. ("AT&T") recently disclosed that it learned on April 19, 2024 that between April 14 and April 25, 2025, a threat actor accessed and copied AT&T call logs of nearly all AT&T's wireless customers. The call logs pertain to customer call and text interactions occurring between May 1 and October 31, 2022 and on January 2, 2023, and include metadata revealing: phone numbers, call counts, aggregate call duration for a day or month and, for a subset of records, one or more cell site identification numbers. AT&T also admitted that publicly available online tools can provide customers' names associated with their telephone numbers.[20] An AT&T spokesperson acknowledged that the stolen data was also housed in Snowflake's systems and confirmed that it intends to notify around 110 million customers of this breach. [21]

40.    A joint investigation conducted by Mandiant, a Google-owned cybersecurity firm, and Snowflake revealed that the threat actors gained access to PII in Snowflake's possession by using Snowflake's customers' compromised credentials, advertising victim data for sale on cybercrime forums, and attempting to extort many of the victims. Specifically, some customers' credentials were previously stolen via infostealer malware, which credentials were then used to access

---

[20] AT&T Inc., Form 8-K (July 12, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000732717/000073271724000046/t-20240506.htm (last accessed July 17, 2024).
[21] Zack Whittaker, *AT&T says criminals stole phone records of 'nearly all' customers in new data breach*, Tech Crunch (July 12, 2024), https://techcrunch.com/2024/07/12/att-phone-records-stolen-data-breach/?guccounter=1 (last accessed July 17, 2024).

customer Snowflake data and exfiltrate the PII. Importantly, the threat actor targeted accounts that did not have multi-factor authentication ("MFA") enabled. Several of the stolen customer credentials were dated as far back as 2020.[22]

41.    The joint investigation summarized the attack against Snowflake was so successful primarily because: 1) "the impacted accounts were not configured with multi-factor authentication enabled, meaning successful authentication only required a valid username and password"; 2) stolen customer credentials "were still valid, in some cases years after they were stolen, and had not been rotated or updated"; and 3) the "impacted Snowflake customer instances did not have network allow lists in place to only allow access from trusted locations."[23]

42.    Indeed, Snowflake's chief information security officer Brad Jones described the Data Breach as a "targeted campaign directed at users with single-factor authentication."[24] The use of MFA is industry standard, and most software as a service vendors allow administrators to enforce MFA. This is common behavior, as users are used to from their Office 365 or Google Workspace environments and other enterprise applications, such as Salesforce and Slack.[25]

---

[22] *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, Mandiant (June 10, 2024), https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last accessed July 17, 2024).
[23] *Id.*
[24] Whittaker, n.16, *supra*.
[25]Solomon Klappholz, *With hundreds of Snowflake credentials published on the dark web, it's time for enterprises to get MFA in order*, IT Pro (June 7, 2024),

43.    Accordingly, Snowflake should have—and could have—prevented the Data Breach by requiring its clients to utilize MFA to safeguard Plaintiff's and Class Members' PII. Not only does Snowflake leave use of MFA up to its clients, but Snowflake does not enable MFA for its clients by default and does not allow its use to be enforced on users by the administrator of its clients.[26] Jon Sternstein of Stern Security finds it "surprising that the built-in account management within Snowflake doesn't have more robust capabilities like the ability to enforce MFA".[27]

44.    Use of MFA to safeguard accounts is common practice and would have prevented client account credentials from being used to gain unauthorized entry to Snowflake's systems. While Snowflake now reports that "we are also developing a plan to require our customers to implement advanced security controls, like multifactor authentication (MFA) or network policies, especially for privileged Snowflake customer accounts," any after-the-fact adoption of MFA is too little, too late.[28]

45.    Moreover, Snowflake "was itself caught out by the incident, saying a former employee's 'demo' account was compromised because it was only protected

---

https://www.itpro.com/security/cyber-attacks/with-hundreds-of-snowflake-credentials-published-on-the-dark-web-its-time-for-enterprises-to-get-mfa-in-order (last accessed July 17, 2024).

[26] *Id*.

[27] Shane Snider, *Snowflake's Lack of MFA Control Leaves Companies Vulnerable, Experts Say*, INFORMATION WEEK (June 5, 2024), https://www.informationweek.com/cyber-resilience/snowflake-s-lack-of-mfa-control-leaves-companies-vulnerable-experts-say#close-modal (last accessed July 17, 2024).

[28] Whittaker, n.16, *supra*.

with a username and password," further highlighting Snowflake's failure to employ MFA.[29]John Paul Cunningham, Chief Information Security Office at Silverfort analogizes Snowflake's failure being "akin to someone picking the lock on your front door and giving them full access to everything in your house. By not using [MFA] on their demo environment, and failing to disable the former employee's access, the Snowflake incident highlights a major gap in identity that companies continue to face."[30]

46.    Snowflake's failure to implement MFA protocols is particularly surprising given that just last year, cybercriminals scraped 6.9 million user and genetic records from 23andMe accounts that weren't protected with MFA. After that breach, 23andM3 subsequently required the use of MFA on all user accounts.[31]

47.    In addition to its failure to adequately employ MFA to safeguard Plaintiff's and Class Members' PII, Snowflake also could have—and should have—prevented the Data Breach by requiring all clients to regularly update their account credentials, especially account credentials that have not been updated for years, and monitored the dark web and popular infostealer marketplaces for compromised credentials. Snowflake also could have—and should have—enforced network allow lists in place to only allow access from trusted locations and otherwise enacted

---

[29] *Id*.
[30] Snider, n.27, *supra*.
[31] *Id*.

policies to more effectively detect and prevent unusual or unauthorized activity.

48.    In sum, upon information and belief, as a result of Defendant's failure to implement adequate data security measures, Plaintiff's and Class Members' PII were negligently released to unauthorized, malicious threat actors and is now at risk of dissemination and use by other unauthorized individuals or cybercrime groups.

### C.    Defendant Failed to Comply with FTC Guidelines.

49.    Snowflake is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

50.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[32]

51.    The FTC recommends that companies verify that third-party service

---

[32] *Start with Security: A Guide for Business*, Fed. Trade Comm'n (June 2015) https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed July 17, 2024).

providers have implemented reasonable security measures, including:[33]

    a.    Identify all connections to the computers where sensitive information is stored;

    b.    Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

    c.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

    d.    Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

    e.    Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

---

[33] *Protecting Personal Information: A Guide for Business*, U.S. Fed. Trade Comm'n (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed July 17, 2024).

f.    Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h.    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i.    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

52.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

53.     Upon information and belief, Snowflake failed to properly implement one or more of the basic data security practices described above. Snowflake's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII resulted in the unauthorized release of Plaintiff's and Class Members' PII to nefarious threat actors. Further, Snowflake's failure to implement basic data security practices constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

54.     Snowflake was at all times fully aware of its obligations to protect the PII of consumers because of its business model of collecting PII and storing payment information. Snowflake was also aware of the significant repercussions that would result from its failure to do so.

55.     Snowflake's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential customer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### D.    *Plaintiff and Members of the Class Have Suffered Concrete Injury.*

56.    For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff, and members of the Class, significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: 1) closely monitor their bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

57.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, because of Defendant's conduct. Further, the value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach.

58.    As a result of Defendant's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their PII.

59.    In 2021 alone, identity theft victims in the United States had financial

losses totaling $16.4 billion.[34]

60.    Besides the monetary damage sustained, consumers may also spend anywhere from one day to more than six months resolving identity theft issues.[35]

61.    Ultimately, the time that victims spend monitoring and resolving identity theft issues takes an emotional toll. Approximately 80% of victims of identity theft experienced some type of emotional distress, and more than one-third of victims experienced moderate or severe emotional distress.[36]

62.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

63.    As a result of Snowflake's failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer injuries, including loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their highly valuable PII; the imminent and certainly impending injury flowing from fraud and identity theft posed by their PII being placed in the hands of criminals; damages to and diminution in

---

[34] Erika Harrell & Alexandra Thompson, *Victims of Identity Theft, 2021*, U.S. Dept. Just., Bureau Just. Stats. (Oct. 2023), https://bjs.ojp.gov/document/vit21.pdf (last accessed July 17, 2024).
[35] *Id*.
[36] *Id*.

value of their PII that was entrusted to Defendant with the understanding the Defendant would safeguard the PII against disclosure; and continued risk to Plaintiff's and the Class Members' PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII with which it was entrusted.

### E. *Plaintiff and Members of the Class Are Now at an Increased Risk of Future Harms.*

64. Data Breaches such as the one experienced by Plaintiff and Class Members are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

65. In 2019, the United States Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[37] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class Members) must take after a Data Breach like Snowflake's are both time-consuming and of only limited and short-term effectiveness.

---

[37] Government Accountability Off., "Data Breaches" (Mar. 2019) https://www.gao.gov/assets/gao-19-230.pdf (last accessed July 17, 2024).

66.    The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[38]

67.    The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[39]

68.    Theft of PII is also gravely serious as PII is a valuable property right.[40]

69.    There may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

---

[38] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," Government Accountability Off. (June 2007), https://www.gao.gov/new.items/d07737.pdf ("2007 GAO Report") (last accessed July 17, 2024).

[39] *See* Identity Theft Victim Checklist, Fed. Trade Comm'n, https://www.identitytheft.gov/Steps (last accessed July 17, 2024).

[40] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("SPI") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("SPI, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[41]

70.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

71.    Because the entirety of the stolen information has *already* been made available for purchase on the dark web, every Class Member, including Plaintiff, is at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

### F.    *Plaintiff's Experience.*

72.    Plaintiff has been Ticketmaster's customer since at least 2014. In connection with the registration of Plaintiff's account, Plaintiff was required to provide her PII to Ticketmaster in exchange for its services. When providing Ticketmaster with her PII, Plaintiff expected that her PII would be kept confidential.

73.    In or around the summer of 2024, Plaintiff received a letter from Ticketmaster informing Plaintiff that her PII had been compromised during the Data

---

[41] *See* 2007 GAO Report, at 29.

Breach. Specifically, Ticketmaster advised Plaintiff that "the personal information that may have been obtained by the third party may have included your name, basic contact information, and payment card information such as encrypted credit or debit card numbers and expiration dates." Plaintiff did not consent to Defendant's release of her PII to threat actors.

74.    Knowing that a threat actor stole her PII and made it freely available on the internet has caused Plaintiff anxiety. She is now very concerned about identity theft and impending privacy harms arising from the Data Breach. Plaintiff further has concerns of Defendant suffering future data breaches or otherwise releasing Plaintiff's PII in the future.

75.    Plaintiff has suffered actual injury from having her PII exposed as a result of the Data Breach, including, but not limited to: (a) paying monies for services Plaintiff would not have purchased had Defendant disclosed that it lacked data security practices to safeguard its customers' PII from theft; (b) damages to and diminution in value of her PII—a form of intangible property that was entrusted to Snowflake; (c) loss of privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

76.    As a result of the Data Breach, Plaintiff will continue to be at a heightened risk for identity theft and attendant damages for years to come.

## CLASS ALLEGATIONS

77.     Plaintiff brings this case individually and, pursuant to Rule 23 of the

Federal Rules of Civil Procedure, on behalf of the following class:

> All individuals in the United States whose PII was compromised in the
> Data Breach (the "Class").

78.     Excluded from the Class is Defendant, its subsidiaries and affiliates, its

officers, directors and members of their immediate families and any entity in which

Defendant has a controlling interest, the legal representative, heirs, successors, or

assigns of any such excluded party, the judicial officer(s) to whom this action is

assigned, and the members of their immediate families.

79.     Plaintiff reserves the right to modify or amend the definition of the

proposed Class prior to moving for class certification.

80.     **Numerosity.** The class described above is so numerous that joinder of

all individual members in one action would be impracticable. The disposition of the

individual claims of the respective Class Members through this class action will

benefit both the parties and this Court. The exact size of the Class and the identities

of the individual members thereof are ascertainable through Defendant's records,

including but not limited to, the files implicated in the Data Breach. Defendant has

not stated the number of individuals implicated in the Data Breach, but the number

is reportedly in the millions.

81.    **Commonality.** This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

a.    Whether Defendant had a duty to protect the PII of Plaintiff and Class Members;

b.    Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII, and breached its duties thereby;

c.    Whether Defendant obtained Plaintiff's and Class Members' PII;

d.    Whether Defendant released Plaintiff's and Class members' PII without authorization;

e.    When Defendant learned of the Data Breach;

f.    Whether Defendant adequately and timely responded to the Data Breach;

g.    Whether Defendant failed to maintain reasonable security systems and procedures, including those required by applicable security laws and regulations and those consistent with industry standards;

h.    Whether Defendant remedied the vulnerabilities that permitted the Data Breach to occur;

i.    Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or other equitable relief as a result of Defendant's wrongful conduct; and

j.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

82.     **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard their PII. Defendant was entrusted with Plaintiff's and Class Members' PII and subsequently released it to an unauthorized third party that made it publicly available on the internet.

83.     **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation and data breach litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

84.     **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is

impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

85.    **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty and released Plaintiff's and Class Members' PII, then Plaintiff and each Class member suffered damages by that conduct.

86.    **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through Defendant's books and records.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On behalf of Plaintiff and the Class)

87.    Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

88.    Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

89.    Snowflake's duty to use reasonable care arose from several sources, including but not limited to those described below.

90.    Defendant has a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By receiving, maintaining, and handling PII that is routinely targeted by criminals for unauthorized access, Snowflake was obligated to act with reasonable care to protect against these foreseeable threats.

91.    Snowflake breached the duties owed to Plaintiff and Class Members and was thus negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Defendant breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by

failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Data Breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

92.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, its PII would not have been compromised.

93.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

a.    Theft of their PII;

b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c.    Costs associated with purchasing credit monitoring and identity theft protection services;

d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.    Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and

adequate measures to protect Plaintiff's and Class Members' data; and

i.   Emotional distress from the unauthorized disclosure of PII to strangers likely to have criminal intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

94.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### (Plaintiff on Behalf of the Class)

95.   Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

96.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Snowflake's duty.

97.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with industry standards.

Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach involving the PII it entrusted from its customers.

98.    Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

99.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

100.    The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act is intended to guard against.

101.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

      a.    Theft of their PII;

      b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

      c.    Costs associated with purchasing credit monitoring and identity theft protection services;

      d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

      e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate,

and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.    Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of PII to strangers likely to have criminal intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

102. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**BREACH OF THIRD-PARTY BENEFIARY CONTRACT**
**(Plaintiff on Behalf of the Class)**

103. Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

104. Plaintiff brings this claim individually and on behalf of the Class.

105. Prior to housing and analyzing data with Defendant's services, each of Defendant's clients, including Ticketmaster, entered into a contract with Defendant, under which, upon information and belief, Defendant agreed to take reasonable steps to protect data stored in their systems, including Plaintiff's and Class Members' PII, and to comply with their statutory and common law duties to protect Plaintiff's and Class Members' PII.

106.    Upon information and belief, each such contract Defendant entered into with its clients was substantially similar with respect to Defendant's duty to safeguard data, including Plaintiff's and Class Members' PII. Further, each such contract was made for Plaintiff's and Class Members' direct benefit, and for each such contract, and Defendant's secure housing of PII was a material obligation that was specifically bargained for.

107.    As set forth above and throughout, Defendant failed to fulfill its obligations to safeguard this data, including Plaintiff's and Class Members' PII. Defendant at all times knew that any such breach of this duty would proximately cause the following harm to Plaintiff and Class Members.

108.    Upon information and belief, Defendant's clients would not have provided their data to Defendant had they known that Defendant would not safeguard it, as promised.

109.    The losses and damages Plaintiff and Class Members sustained, include, but are not limited to:

a.  Theft of their PII;

b.  Costs associated with purchasing credit monitoring and identity theft protection services;

c.  Costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

d.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.  Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.  Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of PII to strangers likely to have criminal intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

110. As a direct and proximate result of Defendant's breach of these contracts, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (Plaintiff on Behalf of the Class)

111. Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

112. Plaintiff brings this claim individually and on behalf of the Class in the alternative to Plaintiff's Breach of Third-Party Beneficiary Contract claim.

113. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII, which cost savings increased the profitability of its services.

114. Upon information and belief, instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the

other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

115. Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

116. Defendant acquired the monetary benefit, PII, through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

117. Had Plaintiff and Class Members known that Defendant had not secured its PII, they would not have agreed to provide PII to Defendant. Plaintiff and Class Members have no adequate remedy at law.

118. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to:

     a.    Theft of their PII;

     b.    Costs associated with purchasing credit monitoring and identity theft protection services;

     c.    Costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.    Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further

breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.   Emotional distress from the unauthorized disclosure of PII to strangers likely to have criminal intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

119.  Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

120.  Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

121.  Moreover, Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for.

**FIFTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(Plaintiff on Behalf of the Class)**

122.   Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

123.   Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et. seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

124.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Snowflake is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Snowflake's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her PII and remains at imminent risk that further compromises of her PII will occur in the future.

125.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

       a.   Defendant owed a legal duty to secure customers PII under the common law and Section 5 of the FTC Act; and

b.    Defendant breached and continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII.

126.    This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect customers' PII.

127.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Snowflake. The risk of another such breach is real, immediate, and substantial. If another breach at Snowflake occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

128.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

129.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another

data breach at Snowflake, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and customers whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief as follows:

a.  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representatives of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

c.  For compensatory, statutory, treble, and/or punitive damages in amounts to be determined by the trier of fact;

d.  For an order of restitution, disgorgement, and all other forms of equitable monetary relief;

e.  Declaratory and injunctive relief as described herein;

f.  Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

g.  Awarding pre- and post-judgment interest on any amounts awarded; and

h.  Awarding such other and further relief as may be just and proper.

## <ins>JURY TRIAL DEMANDED</ins>

A jury trial is demanded on all claims so triable.

DATED this 16th day of October, 2024.

/s/ Domenic A. Cossi
Domenic A. Cossi
Maxwell E. Kirchhoff
Adam M. Shaw
**WESTERN JUSTICE ASSOCIATES, PLLC**
303 W. Mendenhall, Suite 1
Bozeman, Montana 59715
Phone: (406) 587-1900
max@westernjusticelaw.com

Jonathan M. Jagher*
Nicholas R. Lange*
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Phone: (610) 234-6486
jjagher@fklmlaw.com
nlange@fklmlaw.com
*pro hac vice forthcoming*

*Counsel for Plaintiff and the putative class*